UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROSHIEKA JONES,

    Plaintiffs,

vs.                                                             Case No. 11-14972

AMERICAN INSTITUTIONAL
MANAGEMENT SERVICES, LLC,              HON. AVERN COHN

    Defendant.
_____/

## MEMORANDUM AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 18)
## AND
## DISMISSING CASE

### I. Introduction

This is an employment discrimination case under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e. Plaintiff Roshieka Jones (Jones),[1] an African-American woman, is suing her former employer, defendant American Institutional Management Services (AIMS), claiming that she was terminated because of her race and because of her pregnancy.

Before the Court is AIMS's motion for summary judgment. For the reasons that follow, the motion will be granted and the case will be dismissed.

### II. Background

### A. AIMS Hires Jones

---

[1] Jones is proceeding pro se.

AIMS is a Michigan corporation that provides educational services within the traditional public school system and public school academics.  The Dearborn Academy is a Michigan non-profit corporation and a public school academy.  AIMS contracts with the Dearborn Academy to provide education at the school.  AIMS is not a division or part of the Dearborn Academy.

In December 2009, Jones interviewed with AIMS for a secretary position located at the Dearborn Academy.  At the time she interviewed for the position, Jones was four months pregnant.

On or about December 10, 2009, AIMS hired Jones as a temporary, hourly employee earning $11.54 per hour (annualized at approximately $24,000 per year). The AIMS Employee Handbook defines a "temporary employee" as "an employee, either exempt or non-exempt and either full-time or part-time, working on a specific project or for a specific period of time (less than one year), with no fringe benefits other than those mandated by law."  Temporary employees do not accrue vacation or sick leave.  When AIMS hired Jones, they did so with the understanding that after three months, if she "work[ed] out well**,**" she would be eligible for an employment contract with benefits.

Under AIMS's Employee Handbook, contracted employees receive the following benefits:

> Benefits Plan: Benefits provided to full-time and part-time employees vary according to each individual **employee contract** and may include:
>     a)    Benefits as required by law, e.g. Workers Compensation.
>     b)    Holidays (See VII)
>     c)    Sick Days, as per employee contract
>     d)    Vacation time, as per employee contract.
>     e)    Single health coverage available with employee contribution

      of twenty-five percent (25%) for full time employees **after three-month waiting period for new employees**.  Family health coverage is arranged through the Accounting office. Additional costs are paid by the employee.
  f) Waiver of medical coverage. (Emphasis added).

The Handbook further explained that AIMS does not provide paid maternity leave. Instead, the Handbook states that employees on a medical/disability leave (including maternity) "may request the use of accumulated sick, vacation and personal leave time...  After those benefits are exhausted, the remainder of the leave will be without pay and sick/vacation time will no longer accrue."  Employees may not take vacation until they have worked for AIMS for six months.

  AIMS provided Jones with a copy of the Employee Handbook.  Jones signed an Acknowledgment verifying that she had received, read, and understood the Handbook. Jones further verified her understanding that only the AIMS President, Waseem Younis (Younis), had the authority to enter into an employment contract with her.

> I understand and acknowledge that no officer, employee, or agent of American Institutional Management Services, Inc., except for the President, has the authority to enter into or bind the company to a contract of employment with me, and that if such contract of employment is agreed to by the President it must be in writing and signed by the President and me.  (Ex. 7).

It is undisputed that. Younis never provided Jones with a written employment contract or health benefits.

## B.  Jones Begins her Employment

  Jones says that after her hire, she continually had disagreements with two coworkers – accountant, Soha Younes (Younes) and the Principal's secretary, Layla Almaliky (Almaliky).  Jones says that most of her disagreements with Almaliky and

Younes related to work issues, including log-in responsibilities, stocking supplies, or her late arrival back from a lunch break.  Jones also says that during the course of these disagreements Younes stated that "she was babysitting [Plaintiff]," "it's called freedom," and "are you ready to listen."  Jones further says that Younes and Almaliky spoke Arabic in her presence.  Jones alleges that Almaliky told her, "I shouldn't work there because I don't speak Arabic."

Although Jones says that she complained to the Dearborn Academy Principal, Caterina Berry (Berry), regarding these comments, there is no record of any complaints by Jones to Berry.  Rather, there are multiple complaints by Younes regarding Jones's inability or unwillingness to communicate verbally:

> During the secretarial meeting on Friday, Ms. Jones stated that she still feels the need to be addressed via email to avoid confrontation with me.  **I thought that this matter was discussed at the meeting the day before and we all agreed that wasn't the best way of communication and it doesn't show team work.**  I feel that any concerns should have been discussed at the meeting the day before and the need of more effort on Ms. Jones's part for the office to be a comfortable work place for all.  (Ex. 9).

Berry met with Plaintiff to discuss Younes's complaint regarding communication.  At the conclusion of the meeting, Berry wrote that Jones "reiterated that she has no problem with communicating verbally" but wanted "all concerns/issues regarding her work habits/performance in email."  Berry stressed the need for verbal communication, professional courtesy and team work.  Jones responded via e-mail, stating "will do." Jones, however, continued to communicate with Younes only through e-mail, inciting another complaint by Younes regarding Plaintiff's unprofessional workplace behavior.

Despite the alleged problems with her co-workers, Jones did not initiate the AIMS

grievance procedure for harassment or work-related complaints which is spelled out in the Handbook. Jones did not inform the Human Resources Department or any other AIMS employee about her complaint, and she did not notify a supervisor "in writing" and "within 5 working days," as required by the Handbook, of the alleged incidents. Instead, Jones states that the disagreements were "kind of petty" and do not qualify as "some extreme... harassment."

### C. AIMS Approves Jones's Request for Maternity Leave

In April 2010, after three months of employment, Jones contacted Berry regarding her change from a temporary, hourly employee to a contracted employee. At the same time, Jones contacted Human Resources to request paid maternity leave. Despite her temporary status for the first three months, and contrary to terms of the Handbook, Jones argued that she should have accrued vacation and sick leave since the start of her employment in January. In support, Jones informed Human Resources that her checks reported an accrual of vacation and sick days. Human Resources explained to Jones that, as an hourly employee, she had been "mistakenly accruing vacation hours."

In response to Jones's concerns, AIMS gave Jones the accrued vacation and sick leave that would not otherwise have been available without a contract. Rose Laydia in AIMS's Payroll Department determined that "if Ms. Jones is considered salaried from January 2010" she would accrue "10 days or 40 hrs" of vacation/sick leave. Laydia explained, however, that Jones could not accrue leave beyond June 30, 2010, which is the date that contracts for administrative positions expire.

On April 5, 2010, Berry told Jones that AIMS approved her request to accrue

vacation and sick time. Apart from these accrued hours, Berry explained that AIMS does not offer any employee paid maternity leave. Berry explained to Jones "that [she] would not be paid for [her] maternity leave" but "[she] would be contracted until June 30th." (Ex. 8, p. 7). Berry further explained to Jones that upon her return from maternity leave, she would receive a new contract for the next school year.

### D.  Jones's Maternity Leave

On May 14, 2010, Jones had her baby. Jones "requested leave as of May 14, 2010 thru until August 9, 2010." AIMS approved the request. As noted above, AIMS provided Jones the accrued vacation and sick time beginning in January (before she became contracted). As a result, AIMS provided Jones paid maternity leave through June 2010. AIMS further approved Jones request for maternity leave through August 9, 2010.

In addition to her request for paid maternity leave from AIMS, Jones filed a claim for benefits through the Michigan Unemployment Insurance Agency. AIMS Executive Assistant, Rania Zein (Zein), received notice of Plaintiff's claim for unemployment benefits. Upon receipt, she explained to Berry and Younis, "for Roshieka to apply for unemployment with the UIA and put in a request for leave, from May 17, 2010 to August 9, 2010, is not right... She needs to understand that she cannot get unemployment and vacation pay (days earned) at the same time." On June 7, 2010, the Michigan Unemployment Insurance Agency denied Jones's claim, noting "you are currently on an approved leave of absence that you requested beginning 5/16/10. During this time you are considered employed and not eligible for benefits."

In late June, while still on maternity leave, Jones requested that AIMS verify her

employment to a mortgage lender. AIMS provided the requested verification:

> This letter is to verify that RoShieka Jones **is expected to return to work, at the Dearborn Academy, from her maternity leave on August 9, 2010. Upon her return, she will be a contracted full-time employee** at a rate of $11.54 per hour or at $24,000 salary, pertaining all parties are in agreement. If you have further questions, please feel free to contact AIMS personnel office.

(Emphasis Added).

### E. Jones Does Not Return from Maternity Leave and Voluntarily Resigns from Her Employment

On August 5, 2010, Jones contacted Berry requesting an extension to her approved, requested maternity leave. Jones wrote:

> I am contacting you in regards to my leave of absence. As requested, I am scheduled to return to work on Monday, August 9, 2010. I received a call from the school this past Monday about my return. I would like to review and receive a copy of the contract. Also, is there any extension available on my current leave, possibly til August 30, 2010.

The same day, Berry denied Jones's request for an extended maternity leave. Berry wrote, "[Y]ou have been off for nearly 13 weeks, therefore, an extension is not possible... I need you back Monday, August 9th."

On Friday, August 6, 2010, Jones spoke with Almaliky regarding her return to work. She then wrote to Berry confirming her availability and requesting a contract.

Jones did not return to work as requested on August 9, 2010. Berry contacted Jones that day and asked Jones to meet with her on August 11, 2010, to discuss "her contract and work concerns." Jones confirmed in a phone call with Almaliky that she could meet with Berry on August 11, 2010.

At the meeting, Berry provided Jones a draft contract for the next school year.[2] They also discussed Jones' return to work. After the meeting, Jones wrote to Berry again regarding her return to work. She requested accommodation for nursing mothers and to confirm the length of time for her lunch breaks. Jones further stated, "I'm registered for education courses in the Fall, 2010, Am I eligible for the tuition reimburstment (sic)."

AIMS and Berry attempted to reach Jones throughout August regarding her return to work. They contacted Jones nine times via telephone and e-mail. The record shows AIMS called Jones on August 11, 12, 13, 17, 18, 19 and 20. Almaliky eventually wrote Jones, stating "We've been trying to get hold of you this past week, but there is no response and we left a messages. We need you to contact us ASAP." Jones did not return the phone calls or respond to the emails.

On August 16, 2010, Jones told AIMS that she was resigning from her employment. Jones wrote that, "after careful consideration, [she] decided not to return to work for the Dearborn Academy for the 2010-2011 school year. Instead, [she was] registering home-based child care in one of [her] family homes." Jones concluded, "If I should ever again seek employment, hopefully these terms deem me eligible for reconsideration."

### F. Jones's Activities Since her Resignation

Before working at AIMS, Jones received a Bachelor's Degree from Marygrove

---

[2] Berry mistakenly provided Jones a draft copy of a teacher's contract rather than an administrator contract for the 2010-2011 school year. Administrator contracts expire on June 30 each year and do not provide tuition reimbursement (Ex. 1, ¶ 22).

8

College in 2009. Jones testified at deposition that she enrolled in a graduate program at Eastern Michigan University, which started in the Fall of 2010. Since the Fall 2010, Jones has attended Eastern Michigan University full-time. She expects to graduate in December 2012. After her graduation, she plans to operate a child-care facility.

From the time her employment with AIMS ended in August 2010 through March 2012, Jones did not work. (Ex. 2, p. 25). Beginning in April 2012, Jones has received periodic assignments (approximately seven days) as a substitute teacher.

On October 13, 2010, Jones filed a Charge of Discrimination alleging that she had been denied maternity leave and subjected to racial comments. After receiving a right to sue letter, on November 17, 2011, Jones filed a complaint alleging race and pregnancy discrimination.

### III. Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of

the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see Anderson, 477 U.S. at 249–50.

### IV. Analysis

#### A. Hostile Work Environment

To the extent that Jones is claiming she was subjected to a hostile work environment because of her race or pregnancy, she must show that: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her race; (4) the harassment created a hostile work environment; and (5) employer liability. Ladd v. Grand Trunk Western R.R., Inc., 552 F.3d 495, 500 (6th Cir.2009) (quoting Williams v. General Motors Corp., 187 F.3d 553, 561 (6th Cir. 1999)). Title VII is not "a general civility code," and the conduct alleged must be so "objectively offensive as to alter the conditions of the victim's employment." Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 80–81 (1998).

Jones points to the following statements as evidence of racial and/or pregnancy harassment: (1) "its called Freedom,"; (2) "are you ready to listen; (3) "I shouldn't work there because I don't speak Arabic." Jones also says that Younes's comment that she had to "babysit" Jones is evidence of a hostile environment.

None of these comments, whether in isolation or taken together, create a hostile work environment. None of the comments implicate Jones's race. Rather, they are comments from co-workers regarding general work related issues, including Jones's

10

unwillingness to communicate directly with her co-workers and instead only over email. Even if the comments were somehow based on Jones's race or pregnancy, at best they "amount[ ] to 'mere offensive utterances,' which are not actionable under Title VII." Clay v. United Parcel Service, Inc., 501 F.3d 695, 708 (6th Cir. 2007) (finding that 15 specific instances of harassment over the course of two years were not "pervasive"); see also Morris v. Oldham County Fiscal Court, 201 F.3d 784, 790 (6th Cir.2000) (stating that "simple teasing, offhand comments, and isolated incidents" do not create a hostile environment); Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1086 (8th Cir.2010) (finding that sporadic racist comments were insufficient to show a hostile work environment).

### B. Race Discrimination

Title VII forbids an employer from "discharg[ing] any individual, or otherwise ... discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e2(a)(1).

To withstand summary judgment on a race discrimination claim, the plaintiff must either "present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." Johnson v. Kroger Co., 319 F.3d 858, 864–65 (6th Cir. 2003).

To the extent Jones is claiming that AIMS discriminated against her because of her race based on a disparate treatment theory, she must show either direct or circumstantial evidence to support a finding of discrimination.

As to direct evidence, evidence is considered direct when, if such evidence is

11

believed, " 'requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.' " Ondricko v. MGM Grand Detroit, LLC, 689 F.3d 642, 649 (6th Cir. 2012) (quoting Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999).

Jones relies on the same statements set forth above to show direct evidence of racial discrimination. Not only do the statements fail to reflect a hostile work environment based on race, they also fail to establish direct evidence of race discrimination.

Where, as here, Jones has not offered direct evidence, she might prevail if she can establish an inferential case of discrimination under the familiar McDonnell Douglas framework. See McDonnell Douglas v. Green, 411 U.S. 792, 802–05 (1973). That construct addresses proof of discriminatory intent by circumstantial evidence, and it requires Jones to present a prima facie case, whereupon AIMS must offer a legitimate reason for its actions. If AIMS does so, Jones cannot proceed unless she offers some evidence that the defendant's proffered justification is a pretext for unlawful discrimination. See Kline v. Tennessee Valley Auth., 128 F.3d 337, 342 (6th Cir. 1997).

Jones may establish a prima facie case of race discrimination "by showing that: '(1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was ... treated differently than similarly situated nonprotected employees.' " Russell v. Univ. of Toledo, 537 F.3d 596, 604 (6th Cir.2008) (internal citations omitted).

AIMS contends that Jones cannot make out a prima facie case because she cannot show she suffered an adverse employment action nor show that AIMS treated a

12

similarly situated person differently. The Court agrees.

As to an adverse employment action, in Tepper v. Potter, 505 F.3d 508 (6th Cir.2007), the Sixth Circuit explained:

> A materially adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Such a change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."

Id. at 515 (quoting Ford v. General Motors Corp., 305 F.3d 545, 553 (6th Cir. 2002)).

AIMS did not terminate, discharge, or demote Jones. AIMS did not suspend or change her job responsibilities. Rather, Jones voluntarily resigned from her employment. While Jones says that AIMS failed to provide her with a written contract, that is not an adverse employment action. Moreover, to the extent Jones says AIMS failed to provide her with medical benefits, this argument is not factually supported. As explained above, AIMS actually treated Jones as if she was a contract employee, not a temporary employee. AIMS provided her with all of the benefits available to a contract employee at that time, including paid maternity leave from May 17, 2010 to June 2010 and unpaid leave through August 2010. At the conclusion of her leave, AIMS tried several times to contact Jones about returning to work. Jones eventually decided to resign. Under these facts, Jones has not suffered an adverse employment action.

Jones's race discrimination claim also fails because she cannot show that AIMS treated her differently than a similarly situated employee because of her race. None of

the persons Jones' identifies are similarly situation.  Jones says that Tiffany Skiles (Skiles), a teacher, was provided medical benefits before her.  Skiles, however, was not similarly situated to Jones.  Jones held an administrative position.  AIMS explains that teachers receive different contracts than administrators.  Teachers also have differently responsibilities and duties.

Jones also says that Almaliky, the Principal's Secretary, was treated differently than her.  Jones is mistaken.  AIMS hired Almaliky in the summer, before the start of the school year.  Jones was hired mid-year.  Thus, she was entitled to medical benefits before Jones.  Jones further admitted in her deposition that she did not know if Almaliky had a 90 day wait period before receiving benefits.

As AIMS points out, there is one arguably similarly situated employee to Jones.  Zein was hired as an administrative assistant mid-year, on January 3, 2005, like Jones.  Like Jones, Zein was hired on a temporary basis without a contract.  Zein did not receive an employment contract until July 1, 2005.  After receiving an employment contract, Zein did not receive medical benefits until after the 90 day wait period.  Zein was treated exactly in accordance with AIMS' employment policies.  It could in fact be said that Jones was treated more favorably in that AIMS permitted her to accrue vacation and leave time to use on her maternity leave.

Overall, Jones has not established a prima facie case of race discrimination sufficient to survive summary judgment.

Even assuming Jones has made out a prima facie case, the burden of production shifts to AIMS to articulate a legitimate non-discriminatory reason for the adverse employment action.  AIMS only has to produce admissible evidence showing "that the

plaintiff was rejected, or someone else was preferred, for a legitimate nondiscriminatory reason." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142-143 (2000) (Defendant's "burden is one of production only, not of persuasion."). Here, AIMS has articulated a legitimate non-discriminatory reason for its policy regarding medical benefits. Given the cost of such benefits, it is reasonable to require employees to work as contracted full-time employees for 90 days before receiving medical coverage. AIMS likewise has a legitimate business reasons for hiring employees on a temporary basis without providing them with an employment contract to make sure the employee is a good fit. The burden now shifts to Jones to show that this reason is pretextual.

As to pretext, Jones must show that the reasons offered by the employer for its adverse action is not its true reason, but a pretext for intentional discrimination. Burdine, 450 U.S. at 253. This can be done by showing that the employer's reasons "(1) had no basis in fact, (2) did not actually motivate its conduct, or (3) were insufficient to warrant the challenged conduct." Browning v. Department of the Army, 436 F.3d 692, 695 (6th Cir. 2006). Jones has the ultimate burden of producing sufficient evidence from which a jury could reasonably reject AIMS's articulated reason and infer that AIMS intentionally discriminated against her because of her race. Browning, 436 F.3d at 696.

### C. Pregnancy Discrimination

To state a prima facie case for pregnancy discrimination, Jones "must show (1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." Mullins v. U.S. Bank, 296 F. App'x 521, 525 (6th Cir. 2008) (citing Asmo v. Keane, Inc., 471 F.3d 588, 592 (6th Cir .2006)). A causal nexus

can be inferred by demonstrating that similarly situated, non-pregnant employees were treated more favorably. Ensley–Gaines v. Runyon, 100 F.3d 1220, 1226 (6th Cir. 1996) (citing Int'l Union v. Johnson Controls, 499 U.S. 187, 204–05, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991)).

Like her claim of race discrimination, Jones has not made out a prima facie case because she has not suffered an adverse employment action. Again, AIMS provided plaintiff with paid maternity leave based on accrued sick and vacation time (which she was not entitled to but which AIMS decided to grant her) from May 17, 2010 through June 2010 and unpaid leave thereafter. Jones chose not to return to work at the conclusion of her maternity leave.

Moreover, Jones cannot show that a similarly situated non-pregnant person was treated more favorably. Jones argues that she was treated differently because she was not provided with a written employment contract and therefore was not able to get medical benefits during her pregnancy.[3] This argument lacks merit. AIMS hired Jones in January 2010 as a temporary, hourly employee. At that time, Jones did not have an employment contract or benefits. Beginning in April 2010, AIMS treated Jones as a contracted employee. However, she was not entitled to medical benefits at that time. The Employee Handbook provides that newly contracted employees, receive medical benefits only "after a three-month waiting period." In other words, Jones was not eligible for medical benefits until August 2010. As explained above in regards to her

---

[3]Jones testified at deposition that all her medical expenses incurred during her pregnancy and for her child during the first year following his birth were covered under a government program.

race discrimination claim, Jones has not identified any similarly-situated employees who received medical benefits without awaiting the requisite three months after becoming a contracted employee.

Finally, even assuming Jones could make out a prima facie case of pregnancy discrimination, as explained above, AIMS has articulated a legitimate reason for its benefits policy and Jones has not shown the policy was a pretext for discrimination.

### V. Conclusion

Overall, Jones has failed to show that AIMS took any action against her because of her race or pregnancy. AIMS's motion for summary judgment is GRANTED. This case is DISMISSED.

SO ORDERED.


    S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: November 2, 2012


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, November 2, 2012, by electronic and/or ordinary mail.

    S/Julie Owens
Case Manager, (313) 234-5160